UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONAL ASSOCIATION OF HOME
BUILDERS, HOMEBUILDERS
ASSOCIATION OF MICHIGAN, and                    Case Number 20-11780
HOMEBUILDERS ASSOCIATION OF                     Honorable David M. Lawson
SOUTHEASTERN MICHIGAN,

                    Plaintiffs,

v.

UNITED STATES SMALL BUSINESS
ADMINISTRATION, ISABELLA CASILLAS
GUZMAN, JANET L. YELLEN, and
UNITED STATES OF AMERICA,

                    Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND GRANTING PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS

The plaintiffs are several state and national associations of home builders and real estate developers that seek to enjoin the United States Small Business Administration (SBA) from enforcing certain rules that it issued regarding eligibility for loans under the emergency lending authority of the Paycheck Protection Program ("PPP"), which was established by the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. 116-136, 134 Stat 281 (Mar. 27, 2020). They argue that the SBA's regulations contravene the plain language of the legislation, which otherwise would render the plaintiffs' members eligible for PPP loans and loan forgiveness. The defendants have filed a motion to dismiss, arguing that the plaintiffs have not identified a direct injury or otherwise sufficiently alleged associational standing, there has been no final agency action that can be challenged under the Administrative Procedures Act concerning prospective applications for loan forgiveness, and the eligibility rules it enacted are not prohibited by the CARES Act. The plaintiffs have countered with a motion for judgment on the pleadings, in which

they argue that they have established standing to sue on behalf of their members, and the SBA's eligibility rules are invalid as a matter of law. Because defendants' procedural defenses lack merit, and the plaintiffs' argument concerning the SBA's rule making under the first draw PPP program tracks the reasoning of a recent Sixth Circuit decision, which is controlling, the defendants' motion will be denied, and the plaintiffs' motion will be granted.

## I.

Congress passed the CARES Act in response to the dire economic consequences wrought by the COVID-19 pandemic. One of the financial boosts in the legislation was the PPP, intended to help businesses cover expenses and make payroll for their workers to keep them employed during the pandemic. *See* CARES Act, § 1102, 134 Stat. at 286 (codified at 15 U.S.C. § 636(a)(36)). The PPP is targeted at small businesses; loans granted under that program to eligible business may be forgiven if the loaned funds are used for specified expenses. 15 U.S.C. § 636(a)(36)(D)(i); 15 U.S.C. § 9005(b).

The administration of the PPP was entrusted by Congress to the SBA. One of the SBA's main purposes has been to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise." 15 U.S.C. § 631(a). The SBA has "extraordinarily broad powers to accomplish these important objectives, including that of lending money to small businesses whenever they could not get necessary loans on reasonable terms from private lenders." *SBA v. McClellan*, 364 U.S. 446, 447 (1960). Congress has conferred considerable rulemaking powers upon the SBA, authorizing it to "make such rules and regulations as [it] deems necessary to carry out the authority vested in" it, 15 U.S.C. § 634(b)(6); to "take any and all actions . . . when [it] determines such actions are necessary or desirable in making . . . or otherwise dealing with or realizing on loans," *id.* § 634(b)(7); and to

"establish general policies . . . which shall govern the granting and denial of applications for financial assistance by the [SBA]," *id.* § 633(d). "The SBA aids small businesses primarily through financing private loans," but "[t]ypically, it 'prefers to guarantee private loans rather than to disburse funds directly,'" and "most often it operates under 15 U.S.C. § 636(a) through what are called 'section 7(a) loans.'" *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1248 (11th Cir. 2020) (quoting *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 n.3 (1979)).

"[T]he PPP was not created as a standalone program; instead, it was added into § 7(a), albeit with several of that subsection's general eligibility requirements relaxed." *Id.* at 1249 (citing CARES Act, § 1102, 134 Stat. at 286 (amending § 7(a)); 15 U.S.C. § 636(a)(36)(B) ("[T]he Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection [§ 7(a)].")). "For example, in the context of the PPP, the CARES Act relaxes (or expands) the typical § 7(a) definition of businesses that are eligible for a loan." *Ibid.* (citing 15 U.S.C. § 636(a)(36)(D)).

The construction of the eligibility criteria for PPP loans that was included in the CARES Act and codified at 15 U.S.C. § 636(a)(36)(D)(i) is the crux of this case. That subsection, titled "Increased eligibility for certain small businesses and organizations," states as relevant here:

> During the covered period, in addition to small business concerns, *any business concern*, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern described in section 657a(b)(2)(C) of this title *shall be eligible to receive a covered loan if the business concern*, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern *employs not more than the greater of* —
>
> (I)     500 employees; or
>
> (II)     if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern operates.

15 U.S.C. § 636(a)(36)(D)(i) (emphasis added).   The CARES Act also included several other provisions expanding eligibility for particular categories of recipients which, in ordinary times, are not eligible for SBA loans, including sole proprietorships, 15 U.S.C. § 636(a)(36)(D)(ii); businesses in certain industry classifications with multiple locations, where no more than 500 persons were employed at any one location, 15 U.S.C. § 636(a)(36)(D)(iii); and (with certain exclusions) nonprofit "[b]usiness leagues, chambers of commerce, real-estate boards, boards of trade, [and] professional football leagues," 15 U.S.C. § 636(a)(36)(D)(vii); 26 U.S.C. § 501(c)(6). However, other types of business entities, such as publicly traded corporations, explicitly were excluded from participation in the PPP program.   15 U.S.C. § 636(a)(36)(D)(viii).

The PPP initially was funded by Congress with approximately $350 billion, which quickly was exhausted and later supplemented by another $310 billion.   The program initially had a sunset date in August 2020, but subsequent enactments extended the duration of the "first draw" PPP lending program through December 2020.   *See In re Gateway Radiology*, 983 F.3d at 1247 n.1 ("The program lasts during a 'covered period,' which is defined as 'beginning on February 15, 2020 and ending on December 31, 2020.'").

Recognizing the exigencies of the pandemic, "Congress gave the SBA rulemaking power directly related to the PPP, specifying that it 'shall issue regulations to carry out this title.'"   *In re Gateway Radiology*, 983 F.3d at 1249 (citing CARES Act, § 1114, 134 Stat. at 312 (codified at 15 U.S.C. § 9012)).   "And Congress ordered that it be done posthaste, requiring that the implementing regulations be issued '[n]ot later than 15 days after the date of enactment of this Act.'"   *Ibid.* "Recognizing [that] the rulemaking deadline would otherwise be impossible, Congress freed the SBA from having to comply with the notice requirement that is a familiar part of the rulemaking

process." *Ibid.* (citing 15 U.S.C. § 9012) (directing that regulations be issued "without regard to the notice requirements under [5 U.S.C. § 553(b)]").

The SBA acted swiftly on the statutory mandate and issued several "interim final rules" governing the implementation of the PPP.  The first interim final rule, which the plaintiffs in this case challenge, was issued on April 2, 2020 and states, as relevant to this case: "Businesses that are not eligible for PPP loans are identified in 13 CFR § 120.110 and described further in SBA's Standard Operating Procedure (SOP) 50 10, Subpart B, Chapter 2, except that nonprofit organizations authorized under the Act are eligible."  Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811-01.  SBA regulation 120.110 — which was issued and amended in due course during several decades preceding the passages of the CARES Act and implementation of the PPP — lists 18 categories of businesses that typically are not eligible to receive loans from the SBA, including, as pertinent here, "[p]assive businesses owned by developers and landlords that do not actively use or occupy the assets acquired or improved with the loan proceeds," 13 C.F.R. § 120.110(c), and "[s]peculative businesses," 13 C.F.R. § 120.110(s).  However, the SBA later issued a fourth interim final rule, which stated that "[a] business that is otherwise eligible for a PPP Loan is not rendered ineligible due to its receipt of legal gaming revenues, and 13 CFR 120.110(g) is inapplicable to PPP loans."  Business Loan Program Temporary Changes; Paycheck Protection Program — Requirements — Promissory Notes, Authorizations, Affiliation, and Eligibility, 85 Fed. Reg. 23450-01.  The fourth interim final rule explained that "[o]n further consideration, the Administrator, in consultation with the Secretary," had determined that allowing legal gambling businesses to receive PPP loans was "more consistent with the policy aim of making PPP loans available to a broad segment of U.S. businesses."  *Ibid.*

The plaintiffs' members — home builders and real estate developers — would be ineligible for PPP loans and loan forgiveness under 13 C.F.R. § 120.110(c) or (s) or both.  The plaintiffs' complaint pleads in two counts that the SBA's first interim final rule was an agency interpretation contrary to law under the CARES Act, 15 U.S.C. § 636(a)(36)(D)(i); 5 U.S.C. § 706(2)(A)(C), and, in the alternative, that the agency's decisions that allowed some traditionally disqualified businesses (like casinos) to receive PPP loans, while continuing to disqualify others (including the plaintiffs' members), was arbitrary and capricious, contrary to 5 U.S.C. § 706(2)(A).

The defendants moved to dismiss the complaint as failing to state a redressable claim, contending that the SBA's eligibility rules for the PPP accords with the historical criteria in the regulations that excluded certain types of businesses from receiving SBA loans, and Congress enacted the CARES Act with those criteria in mind.  They say that the Court should defer to the agency's interpretation of the legislation.  In a supplement to their motion, the defendants argue that (1) the plaintiff trade associations' allegations of direct harm are insufficient to suggest plausibly that they have suffered any direct injury to their operations from the issuance of the challenged rule, (2) the plaintiffs lack associational standing to sue on behalf of any members who were denied loans, because the complaint does not identify any such members by name, and (3) any members who received loans but fear denial of forgiveness do not have individual standing to sue because there has not been any "final agency action" regarding any prospective applications for loan forgiveness.  In other supplements, the defendants cite decisions from other circuits that agree with their statutory interpretation argument.  *See In re Gateway Radiology*; *Pharaohs GC, Inc. v. United States Small Business Administration*, 990 F.3d 217 (2d Cir. 2021).

The plaintiffs oppose the motion to dismiss and filed a motion for judgment on the pleadings.  Relying on Sixth Circuit precedent, they argue that the exclusion of their member

businesses from the PPP is contrary to the plain language of the CARES Act, which states that "*any* business concern . . . *shall* be eligible" for a PPP loan as long as it meets the enumerated size limitations, and the agency's new rules that incorporate pre-existing regulatory disqualifications was beyond the statutory authority to administer the program that was conferred by Congress. They ask for a judgment in their favor invalidating the first interim final rule insofar as it disqualifies its members from obtaining PPP loans and forgiveness of such loans.

II.

The defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the viability of the complaint. The Court accepts the pleaded facts (but not the unsupported conclusions) as true and determines whether the plaintiff is entitled to legal relief if all the factual allegations in the complaint are taken as true. *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). The plaintiff must plead "enough factual matter" that, when taken as true, "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). "Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The same standards apply to a defensive motion under Rule 12(c). *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006). But defendants are not the only parties that can move under Rule 12(c). That rules states that "[a]fter the pleadings are closed but within such time as not to delay the trial, *any party* may move for judgment on the pleadings." Fed. R. Civ. P. 12(c) (emphasis added). Under Rule 12(c), judgment on the pleadings is appropriate when there are no material facts in dispute and the moving party is "entitled to judgment as a matter of

law." *Paskvan v. City of Cleveland Civil Service Commission*, 946 F.2d 1233, 1235 (6th Cir. 1991).

The controlling issues in this case are purely legal, and the pleadings frame them appropriately for adjudication.

### A.

The defendants contend that the plaintiffs have no standing to challenge the promulgated rules in their own right because they have not alleged any harm to themselves as entities, and because they have not identified any of their members that suffered harm, there is no derivative standing. That argument challenges the Court's jurisdiction, although the motion does not mention Rule 12(b)(1).

Standing, which is required in order to confer subject matter jurisdiction upon federal courts under Article III of the Constitution, is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The standing requirement "limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into 'a vehicle for the vindication of the value interests of concerned bystanders.'" *Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915-16 (6th Cir. 2002) (quoting *Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982)). One of the three components necessary to establish standing to sue under Article III is the demonstration of an injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (stating that a plaintiff also must show that the injury is "traceable" to the defendant's conduct, and the injury likely will be "redressed by a favorable judicial decision"). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*,

578 U.S. 330, ---, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  *Ibid.*  "A 'concrete' injury must be '*de facto*'; that is, it must actually exist."  *Ibid.*

The defendants' argument that the plaintiffs insufficiently have pleaded that they are entitled to sue in their own rights is immaterial, because an organization may have "associational standing" to sue on behalf of its members, "which exists if an association's members have standing; if the interests at stake are relevant to the organization's purpose; and if the claims and relief do not require the participation of individual members."  *Barry v. Lyon*, 834 F.3d 706, 716 (6th Cir. 2016) (citing *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000)).  Both those members who were denied loans and those who obtained them have standing to challenge the final agency action embodied in the enactment of the disqualification rule, because that action clearly worked a tangible injury to them either by denying them access to loans for which Congress expressly had authorized them to apply, or by prospectively foreclosing the forgiveness of loans that they obtained.

The complaint specifically alleges that some of the organizations' members did not obtain loans, and that those loans were refused based on the first interim rule.  The defendants have not cited any legal authority for their assertion that the plaintiff organizations are deprived of standing because the complaint did not identify by name any members whose loan applications were refused.  In addition, the defendants' argument that those members who received loans and fear that they will not be forgiven have not been subject to any final agency action is belied by the defendants' candid admission of the agency's uncompromised position that "if SBA determines that the recipient of a PPP loan was ineligible for the loan in the first instance, *then the loan will not be forgiven*."  Defs.' Supp. Br., ECF No. 27, PageID.301 (emphasis added).  The first interim

final rule was itself a final agency action, which the plaintiffs' members have standing to challenge under the Administrative Procedures Act (APA).  The agency has made clear that is has no intention of walking back the position that was enunciated in that rule with respect to any individual application for forgiveness.

Moreover, "[i]n addition to suing on behalf of its members, an entity may sue 'on its own behalf because it has suffered a palpable injury as a result of the defendants' actions.'"  *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016) (quoting *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 332-33 (6th Cir. 2002)).  The defendants have not mounted any argument that the other customary requisites of associational standing are not satisfied in the circumstances of this case.  The defendants' standing argument, which is premised on an absence of final agency action, therefore is without merit.

B.

As referenced above, the defendants also contend that the rule, at least as applied to members of the plaintiff associations who fear that their loans will not be forgiven, is not subject to challenge because no "final agency action" has been taken.  According to them, if the plaintiffs or their members want to be exempted from disqualification, their recourse is to petition the agency for exceptions, and appeal to this Court only if their administrative pleas are denied.  For those recipients of loans who fear they may not be forgiven on the basis of the agency's espoused view that the applicants were not eligible to receive them in the first place, the defendants contend that they first must apply for forgiveness and have their applications refused, before asking for judicial review.

It is true that only "final agency action" is subject to judicial review via the APA.  That concept "includes the whole or a part of an agency rule, order, license, sanction, relief, or the

equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  However, the defendants' standing argument premised on the supposed lack of "final agency action" must be considered in context with the rapid implementation of the CARES Act.  The "interim final rule" challenged here was issued via an extraordinarily curtailed rulemaking process, which skipped the usual notice and comment proceedings ordinarily contemplated by the APA.  The CARES Act expressly authorized and mandated the expedited process, and the plaintiffs have not challenged the issuance of the interim final rule on procedural grounds.  It is true that "the APA requires agencies to publish a notice of proposed rulemaking in the Federal Register before promulgating a rule that has legal force."  *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, --- U.S. ---, 140 S. Ct. 2367, 2384 (2020) (citing 5 U.S.C. § 553(b)).  But that statement is modified by the caveat, "[u]nless a statutory exception applies."  *Ibid.*  The rush job here was demanded by Congress, and the agency properly complied with that demand.

It is axiomatic that "agency action" subject to judicial review via the APA "*includes the whole or a part of an agency rule*, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13) (emphasis added); *Navistar Int'l Transp. Corp. v. EPA*, 941 F.2d 1339, 1361 (6th Cir. 1991) ("[T]he final, reviewable agency action was taken on Navistar's proposed SIP revision when the acting regional administrator signed the final rulemaking document [which was published in the Federal Register].");  *Ohio v. United States*, 154 F. Supp. 3d 621, 631 (S.D. Ohio 2016), *aff'd*, 849 F.3d 313 (6th Cir. 2017) ("[T]he Court finds that HHS has rendered a 'final agency action' through its notice-and-comment rulemaking.").  The plaintiffs' challenge here is to the textbook example of "final action" explicitly made subject to review by the APA, which was the issuance of the "first interim final rule."  Despite the expedited process, there is no indication in the public record that there was anything tentative or conditional

about the agency's view that was enunciated in the first final interim rule, and there is no indication that the agency intends to abandon its position that the plaintiffs' constituent members are prohibited from receiving any loans via the PPP.

Moreover, the final interim rule plainly satisfies the criteria for a "final agency action." "In *Bennett v. Spear*, 520 U.S. 154 (1997), [the Supreme Court] distilled from [its] precedents two conditions that generally must be satisfied for agency action to be 'final' under the APA. 'First, the action must mark the consummation of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, ---, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett*, 520 U.S. at 177-78).  Nothing in the public record indicates that the rulemaking process was anything other than final and complete, at least as to the plaintiffs' eligibility to receive PPP loans, when the final interim rule was issued.  The rule plainly determined "rights or obligations," by declaring that the plaintiffs' members had no right to receive loans, and, by direct implication, also holding forth that the agency and affiliated lenders were not obligated to grant the plaintiffs' requests for loans.  Legal consequences certainly flowed from the agency's decision, which barred applicants that had not received loans from receiving them, and quite plausibly put those who had received loans into genuine apprehension that their loans may not be forgiven, on the basis that they improperly were obtained by the applicants in the first instance.

## C.

On June 15, 2021, the government filed a notice concerning the status of the PPP program. The program was funded up front with a fixed amount of funding, with an authorization for the SBA to issue loans on a first-come, first-served basis until the available funding was exhausted.

According to the notice, the SBA stopped accepting new loan applications on May 28, 2021, after nearly all of the more than $800 billion in funding had been depleted.  The government represents that after that date only a limited reserve of $1 billion remains, which has been allocated to cover commitments already made under the program, along with approximately $156 million in funds that have been reserved to cover loans that could be issued to parties involved in pending litigation.

If, during the pendency of a case, an event occurs that makes it impossible for a court to grant any relief to the prevailing party, the case must be dismissed.  *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992); *Edwards v. Dewalt*, 681 F.3d 780, 788 (6th Cir. 2012).  That is because under "Article III[,] . . . a justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed.'"  *United States v. Juvenile Male*, 564 U.S. 932, 936 (2011) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)).  The Court "lacks jurisdiction to consider any case or issue that has 'lost its character as a present, live controversy' and thereby becomes moot."  *Demis v. Sniezek*, 558 F.3d 508, 512 (6th Cir. 2009) (citing *Hall v. Beals*, 396 U.S. 45, 48 (1969)); *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) ("Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).") (quotations marks omitted).  "Because the exercise of judicial power under Article III of the Constitution depends on the existence of a live case or controversy, mootness is a jurisdictional question."  *Ibid.* (citing *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).

Because the PPP apparently has run its course with respect to any new business applications, any prospective injunctive remedy will be limited, and some aspects of the plaintiffs' prayer for relief may be moot.  However, the present status of the program has no impact on the

merits of the APA challenge to the prior rulemaking.  The plaintiffs in this case ask for declaratory relief holding that the agency cannot prospectively seek to recapture any loans that may have been issued to their members on the basis that the recipients were prohibited from receiving the funds in the first instance.  Therefore, even if no more of the plaintiffs' members can obtain loans in the future, their prayer for protective declaratory relief is not moot.

D.

The plaintiffs' challenge to the SBA's eligibility rules under the first draw PPP is grounded in the language of the legislation.  They contend that the defendants' interpretation of the CARES Act and the promulgation of the first interim final rule purporting to import historical regulatory disqualifications into the eligibility criteria for PPP loans squarely contradicts the express language defining eligibility that was enacted by Congress, and the undisputed allegations and facts in the public record demonstrate that the agency's promulgation of the rule was unlawful and should be held to be so under 5 U.S.C. § 706(2)(C).  Although there is persuasive authority from other circuits that validates the SBA's rulemaking, the plaintiff's argument has clear and binding support from the Sixth Circuit.

The defendants contend that the Court should defer to their interpretation of the statute as including the authority to enact rules for eligibility that are consistent with the conventional section 7(a) loan requirements, and therefore the rules are not "in excess of the [its] statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).  When determining whether an interim final rule exceeds the agency's statutory authority, Courts apply the two-part framework set out in *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  That framework can result in a court deferring to an agency's interpretation of a statute, "even if the court does not consider it to be the best interpretation."  *Thornton v. Graphic Communs. Conf. of the Int'l Bhd. of Teamsters*

- 14 -

*Supplemental Ret. & Disability Fund*, 566 F.3d 597, 609 (6th Cir. 2009) (citing *Nat'l Cable & Telcomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)).  This "*Chevron* deference" is based on the recognition that courts should accord "considerable weight" "to an executive department's construction of a statutory scheme it is entrusted to administer."  *Id.* at 844.  But before any interpretive deference is appropriate, "applying the ordinary tools of statutory construction, the court must determine whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court . . . must give effect to the unambiguously expressed intent of Congress."  *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).

Applying those "ordinary tools" of interpreting a statute, courts "look first to its language, giving the words used their ordinary meaning."  *Artis v. District of Columbia*, --- U.S. ---, 138 S. Ct. 594, 603 (2018) (citations and quotation marks omitted).  Then courts apply "traditional rules of statutory interpretation."  *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 112 (2014).  In fact, "a court must exhaust all the 'traditional tools'" before it can conclude that there is a "genuine ambiguity."  *Kisor v. Wilkie*, --- U.S. ---, 139 S. Ct. 2400, 2415 (2019) (discussing *Auer* deference, *see Auer v. Robins*, 519 U.S. 452 (1997)).  If, after those steps, the statute's meaning is clear, the Court goes no further.  *See BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004).  Deference under *Chevron* is allowed only if, after that analysis, an ambiguity remains.  *City of Arlington*, 569 U.S. at 296 (holding that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute").

Step one is not presented in this case on a clean slate.  That statute in question states that "any business concern . . . shall be eligible to receive a covered [i.e., SBA guaranteed] loan" if it

has less than 500 employees or less than the size standard in number of employees established by the Administration for the industry in which the business operates.  15 U.S.C. § 636(a)(36)(D)(i). Another judge in this district has determined that this language is unambiguous and issued an injunction prohibiting the SBA from enforcing its rules that restrict eligibility beyond those criteria.  *DV Diamond Club of Flint, LLC v. United States Small Bus. Admin.*, 459 F. Supp. 3d 943, 956-58 (E.D. Mich. 2020).  The Sixth Circuit affirmed that decision.  960 F.3d 743 (6th Cir. 2020). The court of appeals considered the factors for issuing an injunction and reasoned:

> In applying *Chevron* to the first factor — likelihood of success on the merits — the district court determined that the CARES Act unambiguously foreclosed the SBA from precluding sexually-oriented businesses from receiving PPP loan guarantees during the pandemic. It relied on language in the Act specifying that eligibility would be conferred to "any business concern."  15 U.S.C. § 636(a)(36)(D)(i). The term "any" carries an expansive meaning.  *See SAS Inst., Inc. v. Iancu*, --- U.S. ---, 138 S. Ct. 1348, 1354 (2018).  It "refer[s] to a member of a particular group or class without distinction or limitation" and, in this way, "impl[ies] every member of the class or group."  *Id.* (quoting Oxford English Dictionary (3d ed., Mar. 2016)).  Thus, the Act's specification that "any business concern" is eligible, so long as it meets the size criteria, is a reasonable interpretation.  That broad interpretation also comports with Congress's intent to provide support to as many displaced American workers as possible and, in doing so, does not lead to an "absurd result" as the SBA claims.  Finally, by specifying "any business concern," Congress made clear that the SBA's longstanding ineligibility rules are inapplicable given the current circumstances.  Neither may the SBA continue to apply these rules pursuant to § 636(a)(36)(B), which states: "Except as otherwise provided in this paragraph, the [SBA] may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection."  15 U.S.C. § 636(a)(36)(B).  This provision likely constitutes a catch-all governing procedures otherwise unaffected by the mandate of the CARES Act and the PPP and does not detract from the broad grant of eligibility.
>
> The SBA points out that the CARES Act specifies that "nonprofit organization[s]" are eligible for PPP loans, even though they are ineligible for ordinary SBA loans.  *See* 15 U.S.C. § 636(a)(36)(D)(i).  Therefore, it reasons, if Congress wanted sexually-oriented businesses to be eligible for PPP loan guarantees, it would have said so.  This specification, however, supports the district court's analysis.  It was necessary to specify non-profits because they are not businesses, whereas the Act's specification that eligibility is conferred on "any business concern" encompasses sexually oriented businesses such as strip clubs that would ordinarily be ineligible for loans.

*Id.* at 746-47.

The defendants argue that the Eleventh Circuit's recent decision in *In re Gateway Radiology Consultants* supports their position, where the court of appeals observed that, historically, "Section 7(a) loans [have been] subject to certain eligibility requirements.  One [was] that an applicant must be a 'small business concern,' and the SBA is authorized to 'specify detailed definitions or standards by which a business concern may be determined to be a small business concern.'"  938 F.3d at 1248 (quoting 15 U.S.C. § 632(a)(2)(A)).  However, the *Gateway Radiology* court addressed a distinct and readily distinguishable question from that presented in this case, which was whether the SBA exceeded its legislative mandate by disqualifying an entity presently involved in bankruptcy proceedings from receiving loans under the PPP.  The *Gateway* court, after undertaking a full two-step *Chevron* analysis, held that "[t]he SBA did not exceed its authority in adopting the non-bankruptcy rule for PPP eligibility, because "[t]hat rule does not violate the CARES Act, is based on a reasonable interpretation of the Act, and the SBA did not act arbitrarily and capriciously in adopting the rule."  983 F.3d at 1264.

That holding is not contrary to, and does not call into question, the holdings of the district court or the Sixth Circuit in the *DV Diamond* litigation.  That is because, unlike the very different regulations that were challenged in *DV Diamond* and here, the bankruptcy disqualification was rooted in an express and co-equal statutory creditworthiness limitation embodied by 15 U.S.C. § 636(a)(6), which mandates that "*[a]ll loans made under [§ 7(a)] shall be of such sound value or so secured as reasonably to assure repayment.*"  (Emphasis added).  The *Gateway* court found that, because nothing in the CARES Act mentioned, or even alluded to, the creditworthiness of potential applicants, the statute was silent on whether a bankrupt entity would qualify, and there was, therefore, room for agency interpretation on whether the pre-existing regulatory ban on issuance

- 17 -

of any SBA loans to such an entity ought to also prevail under the PPP program.  In the absence of any express Congressional pronouncement on the issue, the *Gateway* court found that the agency's decision to enforce the long-standing policy against lending to bankrupt entities was a reasonable interpretation of its statutory mandate.

The rule at issue here, however, concerns a topic on which Congress *has* expressly spoken, and its express words plainly contradict the defendants' reading of the statute.  The lack of clear Congressional direction was crucial to the holding in the *Gateway* decision, and the question presented there was distinct from the interpretational issue in this case.  *In re Gateway Radiology*, 983 F.3d at 1256 ("Starting with step one, *we ask whether Congress has directly spoken to the question at issue, which is whether bankruptcy debtors are eligible for PPP loans* — whether they are what the statute calls 'eligible recipients.'"); *id.* at 1249 ("*What the CARES Act did not do for PPP loans is also significant.*  It did not exempt them from the § 7(a) sound value requirement.") (emphases added).  It was the absence of any express pronouncement that permitted the *Gateway* court to proceed to the second step of the *Chevron* analysis.  No such deficiency of legislative imperative is found in the statute here, where section 636(a)(36)(D)(i) enunciates in no uncertain terms the criteria respecting the *types* and *sizes* of entities that may apply for PPP loans.  As the *DV Diamond* holdings make clear, "any" means any, and "shall" means shall.  Any business within the specified size ranges may apply, and the SBA must lend to them.  Moreover, the holdings in *DV Diamond* and *Gateway* are entirely harmonious because the PPP provisions, read within the context of the full statutory scheme, consistently may be read as providing both that *all* bankrupt entities are disqualified from receiving *any* loans from the SBA (including any loan issued through the PPP program), and that "*any* business concern" which is not presently financially defunct may apply for and receive a loan issued within the discrete scope of the PPP.

In a supplemental filing, the defendants cite *Pharaohs GC, Inc. v. United States Small Business Administration*, which directly contradicts the Sixth Circuit's *DV Diamond* decision. *See* 990 F.3d 217, 226-27 (2d Cir. 2021). But instead of finding an ambiguity that triggered *Chevron* deference, the Second Circuit found no ambiguity in Congress's conferral of rulemaking authority on the SBA for the PPP. It reasoned that subparagraph D's language ("any business concern . . . shall be eligible") was entirely consistent with an authorization to the SBA to establish eligibility criteria tracking earlier section 7(a) loan programs, when the statute was read as a whole. *Id.* at 226 ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . ."). That court reasoned that "[t]he PPP was not created as a standalone program but was added into the existing § 7(a) program, which subjects it to existing conditions and regulations, as well as existing SBA authority. Reading subparagraph D in the context of the SBA's 7(a) loan program, it is clear that Pharaohs's interpretation — i.e., 'any business concern' means 'every business concern' — is not tenable." *Id.* at 227.

That may be a reasonable view of the issue presented, but it is not without complications. For one, it relies on a discernment of legislative intent that is based on an implication: that Congress enacted the PPP against the background of the SBA's traditional regulations and therefore intended the SBA to apply them to the new program. For another, the decision ignores the Supreme Court's recent disquisition on the term "any" in *SAS Institute, Inc. v. Iancu*, where it found that "'any' naturally carries 'an expansive meaning'"; and that the word "impl[ies] *every* member of the class or group." 138 S. Ct. at 1354 (quoting Oxford English Dictionary (3d ed., Mar. 2016) (emphasis added)). Under that guidance, then, "any business" actually does mean "every business."

Moreover, the *Pharaohs GC* case's reasoning is not controlling in this circuit. *DV Diamond Club* is controlling authority that conclusively forecloses the result that the defendants

advocate.  The Sixth Circuit expressly held that the construction of the statute adopted by the district court was a reasonable result, reached through natural application of the ordinary rules of statutory construction. The conclusion that the statutory language was unambiguous, comprehensive, and exclusive in defining eligibility criteria for PPP applicants bars this Court from undertaking any attempt to discern ambiguity or extend deference to the defendants' contrary reading.

The plaintiffs' position is further bolstered, and the reasoning of the *DV Diamond* cases is reinforced, by the distinctly different and more detailed language that Congress used in the subsequent enactment of the Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182 (Dec. 27, 2020), which authorized the SBA to issue or guarantee so-called "second draw" PPP loans to certain businesses that previously obtained initial PPP loans under the CARES Act. CAA 2021, Div. N, § 311(a) (adding 15 U.S.C. § 636(a)(37)).  The Appropriations Act added a new and much more developed definition of "eligible entities" authorized to apply for "second-draw" loans, which — in conspicuous contrast with the provisions authorizing the "first draw" PPP program — expressly excluded entities disqualified under 13 C.F.R. § 120.110, including both "passive" and "speculative" businesses covered by 120.110(c) and (s).  15 U.S.C. § 636(a)(37)(A)(III)(aa) (providing that the term "covered entity" "does not include . . . (aa) any entity that is a type of business concern (or would be, if such entity were a business concern) described in section 120.110 of title 13, Code of Federal Regulations (or in any successor regulation or other related guidance or rule that may be issued by the Administrator) other than a business concern described in subsection (a) or (k) of such section.").  The adoption of that language in the subsequent enactment proves that Congress was, and is, well aware of the regulatory background against which the original PPP was created, and that when it desires to do

so it knows exactly how to adopt and endorse previously issued regulatory qualifications.  The fact that it did not do so when it authorized the first PPP program reinforces the conclusion that the choice to promulgate its own separate, simplified, all-inclusive — and, at least as to entity type and size, entirely exclusive — eligibility criteria was both reasoned and deliberate.

Similarly, in its subsequent enactment of the American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (Mar. 11, 2021), Congress expanded the eligibility for PPP loans for certain non-profit entities, and in doing so it again expressly incorporated the limitations embodied in the SBA's regulations under 13 C.F.R. § 120.110.  The disqualification enacted in the ARPA was included in verbatim provisions of the PPP "second-round" enabling statute.  The inclusion of additional explicit constraints in the later enactments reinforces rather than contradicts the conclusion that such limitations deliberately were omitted by Congress when it authorized the first-round PPP.

Contrary to the defendants' position, the policy choices made by Congress when it enacted both the first and second round PPPs are entirely rational and based on obvious, widely recognized historical economic facts.  The first draw program was enacted as part of an urgent legislative attempt to cope with the devastating, unprecedented, and rapid economic decline that occurred when states around the nation slammed the brakes on normal economic output by drastically curtailing in-person work and personal movement for non-essential purposes.  The resulting economic decline widely has been described as "the worst [economic] contraction in history"; however, as our civil society has adapted to the limitations inherent in living with a pandemic, that drastic decline also has yielded "to one of the fastest recoveries" in history, and "the unemployment rate that hit a peak of 14.7% in April [2020] has since come down to 6.9% as of October."  Fortune,

*Not Everyone is Feeling the Recovery*, https://fortune.com/2020/11/14/covid-recovery-economy-unemployment-gdp-manufacturing-outlooks/.

It was both consistent and entirely economically and politically rational for Congress to believe, first, that the broadest possible allowance of credit was called for in the opening weeks and months of the pandemic crisis, in order to keep as many citizens gainfully employed as possible, during the trough of the initial rapid decline, and, second, that under the changed circumstances nine months later, when the economy significantly had recovered from the initial shock, a further stimulus with more restrictive lending criteria was more appropriate.  Thus, while lending to "any" business concern without regard to type was prudent in April 2020, adopting more stringent criteria in December 2020 was judged more suitable.

Finally, the defendants' argument that a literal reading of the statutory eligibility criteria would lead to "absurd results" is a bugaboo that was rejected by both the district court and the court of appeals in the DV Diamond decisions.  *DV Diamond Club*, 960 F.3d at 746-47 ("[T]he Act's specification that 'any business concern' is eligible, so long as it meets the size criteria, is a reasonable interpretation. That broad interpretation also comports with Congress's intent to provide support to as many displaced American workers as possible and, in doing so, does not lead to an 'absurd result' as the SBA claims."); 459 F. Supp. 3d at 961 n.7 ("First, all federal spending statutes — including the PPP — necessarily limit spending to lawful pursuits even without specifying that limitation. Second, the term 'any business concern' in the PPP is naturally read in light of the 'ordinary assumption' that a statute passed by Congress 'applies domestically, not extraterritorially.' Thus, the Court's conclusion that the PPP Ineligibility Rule may not be enforced does not lead to the absurd result that PPP loans must be extended to businesses committing crimes

or businesses located outside the United States.") (citations omitted).  The defendants have offered no more persuasive reasons here for the Court to adopt that chimerical position.

III.

There are no material facts in dispute.  The issues presented are purely legal that may be decided based on the accepted facts stated in the pleadings.  The plaintiffs have standing to sue on behalf of their members, and the challenged rules constitute a final agency action.  For the reasons stated above, the SBA's rules declaring ineligible for PPP loans the plaintiffs' member businesses are invalid and cannot be enforced against them.

Accordingly, it is **ORDERED** that the defendants' motion to dismiss (ECF No. 19) is **DENIED**.

It is further **ORDERED** that the plaintiffs' motion for judgment on the pleadings (ECF No. 38) is **GRANTED**.

It is further **ORDERED** that the SBA's rules declaring ineligible for PPP loans, loan guarantees, and loan forgiveness "[p]assive businesses owned by developers and landlords that do not actively use or occupy the assets acquired or improved with the loan proceeds," 13 C.F.R. § 120.110(c), or "[s]peculative businesses," 13 C.F.R. § 120.110(s), exceed its statutory authority under the CARES Act and are **DECLARED** invalid.

It is further **ORDERED** that the defendants are prohibited from disqualifying the plaintiffs' member businesses from receiving loans, loan guarantees, and loan forgiveness for the reasons that they are "[p]assive businesses owned by developers and landlords that do not actively

use or occupy the assets acquired or improved with the loan proceeds," 13 C.F.R. § 120.110(c), or

"[s]peculative businesses," 13 C.F.R. § 120.110(s).

s/David M. Lawson

DAVID M. LAWSON
United States District Judge

Dated:   September 28, 2021